**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PENNSYLVANIA NATIONAL MUTUAL    *
CASUALTY INSURANCE COMPANY,

                              *

       **Plaintiff,**

                              *

       **v.**                         *              **Civ. No. JKB-23-02746**

GENERALI–U.S. BRANCH D/B/A THE
GENERAL INSURANCE COMPANY OF    *
TRIESTE & VENICE–U.S. BRANCH,

       **Defendant.**                 *

      *      *      *      *      *      *      *      *      *      *      *      *

## MEMORANDUM

This is an insurance coverage dispute between Plaintiff Pennsylvania National Mutual Casualty Insurance Company ("Penn National") and Defendant General–U.S. Branch ("Generali"). The parties disagree over their respective responsibilities for providing coverage for a legal defense to several insured parties in an earlier lawsuit. The Court has diversity jurisdiction under 28 U.S.C. § 1332(a).

Discovery in the case has concluded, and Generali has filed a Motion for Summary Judgment. (ECF No. 64.) The Motion is fully briefed, and no hearing is required. For the following reasons, the Motion will be granted, and judgment will be entered in Generali's favor.

## I. BACKGROUND

### A. *STATEMENT OF FACTS*

Except as otherwise noted, the following facts are undisputed.

#### 1. The *Twarowski* Action—An Overview

In January 2018, Agnieszka Twarowski booked a vacation rental property in McHenry,

Maryland for May 25 to May 28, 2018. *Twarowski v. Heart's Desire DCL, LLC*, Civ. No. SAG-20-00815, ECF No. 22-2 at 1 (D. Md. 2020). The vacation was ill-fated. On May 26, a wooden deck railing at the property collapsed, causing Twarowski and two other guests to fall off the deck and sustain severe injuries. *Twarowski*, ECF No. 58 at 1. These injuries included permanent paraplegia, spinal injuries requiring surgery, and related emotional distress. (*See* ECF No. 64-1 at 9–11.)

A lawsuit followed. In March 2020, Twarowski, along with five other individuals who had been guests at the McHenry property, filed a complaint in this Court, naming as defendants over a dozen individuals and business entities. *See generally Twarowski*, ECF No. 1. To understand who the defendants in the *Twarowski* action were, a brief overview of the somewhat tangled web of ownership and management of the McHenry property is needed. The owner of the McHenry property at the time of the incident was Heart's Desire DCL, LLC ("Heart's Desire"). (ECF No. 64 at 6; ECF No. 65-1 at 4.) Heart's Desire had entered into an "Exclusive Property Management Agreement" with Taylor & Refosco, LLC ("T&R"), which at different times has done business under two slightly different tradenames—"Taylor-Made Deep Creek Vacations," and "Taylor-Made Deep Creek Vacation & Sales" ("Taylor-Made"). (ECF No. 64 at 6, 18 n.32; ECF No. 65-1 at 4; *see generally* ECF No. 64-9); *see also Twarowski*, ECF No. 22-2 (affidavit attesting to the fact that Taylor-Made was a tradename of T&R).[1] The members of T&R were Chad Taylor, Joe Refosco, and Jodi Taylor-Refosco (collectively, the "Taylor/Refoscos"). (ECF No. 64 at 19, 65-1

---

[1] To make matters more confusing, there is a separate entity, "Taylor-Made Deep Creek Real Estate, LLC" ("Taylor-Made Real Estate"), which may have also used the tradename "Taylor-Made Deep Creek Vacation & Sales." *See Twarwoski*, ECF No. 22-2 at 2; (ECF No. 64-9 at 3). This company was in the business of real estate transactions, and was not involved in the vacation rental business. *Twarowski*, ECF No. 22-2 at 2. Taylor Made Real Estate was a defendant in the *Twarowski* action, but neither Penn National nor Generali provided a defense to Taylor-Made Real Estate, and it does not appear that Taylor-Made Real Estate is relevant to the current action. (*See generally id.*; *see also* ECF No. 64 at 7 n.1.)

at 4.) T&R, in turn, contracted with HomeAway Holdings, Inc., d/b/a VRBO ("HHI"), which handled the processing of reservations to stay at the property. (ECF Nos. 64 at 6, 65-1 at 4.) Heart's Desire, T&R, the Taylor/Refoscos, and HHI were all named as defendants in *Twarowski*, along with other parties not relevant to the instant action. *See generally Twarowski*, ECF No. 1.

Generali provided a commercial liability policy to HHI for the period of May 8, 2018, to May 8, 2019. (ECF No. 64-6 at 3 (Generali Policy).) The Generali Policy also extended coverage to Heart's Desire and T&R (the owner and manager, respectively, of the McHenry property) by operation of a clause providing, in relevant part, that "[a]ny person or organization that rents a property to a third party through [HHI's] website" is an insured. (*Id.* at 15.) The parties dispute whether the Generali Policy also extended coverage to the Taylor/Refoscos; the Court will address the details of this dispute *infra* Part I.A.2.

Penn National, in turn, provided a commercial liability insurance policy directly to T&R. (ECF No. 64-10 (Penn National Policy).) The Taylor/Refoscos were also insureds under the policy, pursuant to a clause providing that the members of any insured LLC are insured "with respect to the conduct of [the insured LLC's] business." (*Id.* at 98.)

Non-party Frederick Mutual Insurance Company also insured Heart's Desire. (*See* ECF No. 66-1 at 15.)

Generali states (and Penn National does not dispute) that "[b]y all accounts, the [*Twarowski*] Action was a 'bad case' involving severe, permanent injuries," and that the defendants understood early on that liability was probable. (ECF No. 64 at 15; *see also* ECF No. 64-1 at 5 (Frederick Mutual report from February 2021, estimating probability of judgment in favor of the defendants to be "likely less than 10%").) Further, the *Twarowski* defendants recognized that the settlement value of the case was likely to be high, given the severity of the

plaintiffs' injuries. (*See* ECF No. 64-1 at 13–14 (estimating the total settlement value at approximately $7 million).) During the *Twarowski* litigation, Generali paid for the defense of Heart's Desire, but did not contribute toward the defense of T&R or the Taylor/Refoscos. (ECF No. 64 at 8.) Penn National and Frederick Mutual equally split the defense costs of the latter two groups. (*Id.*)

In October 2021, counsel for Generali sent a settlement offer by email to the *Twarowski* plaintiffs' counsel, "offer[ing] to pay Generali's full remaining limit of liability, that is, $1 million less all costs of defense, in return for full and final releases and dismissals with prejudice as to Generali's Insureds." (ECF No. 64-7 at 2.)

In September or October 2022, following about two-and-a-half years of litigation and multiple rounds of mediation, the parties to the *Twarowski* action settled for an undisclosed amount. *See Twarowski*, ECF No. 183; *see also* (ECF No. 64 at 7–8). All three insurers—Frederick Mutual, Generali, and Penn National—contributed toward the settlement. (ECF No. 64 at 8.) Penn National "contributed $3,985,000 to the total settlement on behalf of [T&R]." (ECF No. 1 ¶ 16; *see also* ECF No. 43 at 3 (Generali admitting the same).) Generali alleges—and Penn National does not dispute—that it contributed $965,000, which represented the limit of the Generali Policy less the $35,000 that had already been expended on legal costs. (ECF No. 64 at 15 & n.20.) There is no evidence or allegation in the record about how much Frederick Mutual contributed toward the settlement.

### 2. The Parties' Disputes

Having set out the basic overview of the *Twarowski* action, the Court turns to the factual issues at the heart of this case. The crux of the dispute is that Penn National contends that Generali breached its legal obligations by failing to provide a legal defense to T&R and to the

4

Taylor/Refoscos during the *Twarowski* litigation, and that this failure forced Penn National to pick up the tab. Penn National has essentially two theories for why it should prevail. First, it contends that the Generali Policy is primary over the Penn National Policy, that the Taylor/Refoscos are insureds under the Generali Policy, and that Generali breached its duty to defend by failing to defend either T&R or the Taylor/Refoscos (collectively, the "Taylor Parties"). (*See generally* ECF No. 65.) Penn National also argues that—separate and apart from any liability Generali had under its insurance policy—Generali also incurred a legal obligation to defend the Taylor/Refoscos by virtue of an agreement that it entered with Penn National in April 2020 regarding defense cost sharing. (*Id.*)

The Court will first examine the relevant provisions of the Generali and Penn National Policies. It will then turn to the history of the parties' discussions and disputes surrounding the *Twarowski* litigation, including the purported April 2020 cost-sharing agreement.

### a. *The Generali Policy*

The Generali Policy was issued to HHI for the period of May 8, 2018, to May 8, 2019. (ECF No. 64-6 at 3.) The policy provides for a $1 million limit "for each occurrence per rental agreement" and an "aggregate limit" of $1 million "per rental property." (*Id.* at 5.) Section I, which defines the scope of the policy's coverage, provides in relevant part:

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages and "claims expenses" is limited as described in SECTION III - LIMITS OF INSURANCE; and

> (2) Our right and duty to defend ends when we have used up the
> applicable limit of insurance in the payment of judgments,
> settlements or "claims expenses" under Coverages A or medical
> expenses under Coverage B.
>
> No other obligation or liability to pay sums or perform acts or services is
> covered unless explicitly provided under Supplementary Payments.

(ECF No. 64-6 at 9.) Another provision in Section I of the Policy states that "attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request shall be considered 'claims expenses' and shall reduce the limits of insurance." (*Id.* at 14.) This provision, in concert with section I.1.a(2), makes the Generali Policy an "eroding" or "eroding limits" policy, meaning that defense costs incurred by the insurer count toward the total policy limit. (By contrast, a non-eroding policy would exempt such costs from the policy limit.) *See N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 559 (5th Cir. 2008).

Section II is entitled "Who is an Insured." (ECF No. 64-6 at 15.) It states in relevant part:

1. You [*i.e.*, HHI] are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also insured: . . .

    b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

3. Any person or organization that rents a property to a third party through your website or the website of your parent, its subsidiaries or affiliates using your checkout, either directly or through your API, but only with respect to liability arising out of the ownership, maintenance or use of such property under the terms and for the duration of a "rental agreement" for such rental property.

Section IV, Subsection 4, is entitled "Other Insurance." (ECF No. 64-6 at 17.) The operative version of this clause is found in an amendment to the policy. (*See id.* at 24–25.) This subsection provides, in relevant part:

6

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A of this Coverage Part, our obligations are limited as follows:

> **a. Primary Insurance**
>
> This insurance is primary except when Paragraph b. or Paragraph c. below apply.
>
> **b. Excess Insurance**
>
> > (1) This insurance is excess over: . . .
> >
> > > (d) Other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.
> >
> > (2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . .
>
> **c. Co-Primary Insurance**
>
> If this insurance is primary and any of the other insurance is also primary, then we will share with that other insurance by the method described in Paragraph d. below. If this insurance is excess and the other insurance purports to be excess by virtue of competing "other insurance" clauses similar to the clause set forth in Section 4.b. above, then those clauses are mutually repugnant, resulting in co-primary insurance that is shared by the method described in Paragraph d. below.
>
> **d. Method of Sharing**
>
> Defense expenses will be shared equally among primary insurers. For indemnity, if the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer will contribute equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(ECF No. 64-6 at 24–25.)

### b. *The Generali Summary Document*

Finally, there is an additional document that Penn National argues is relevant to understanding the terms of the Generali Policy. This document, entitled "$1M Liability Insurance Policy Summary," is attached to Penn National's opposition briefing. (ECF No. 65-2.) Generali disputes the authenticity of the document, noting (correctly) that it "lists no author, date, or any indication regarding where it came from." (ECF No. 66 at 3.) Generali also contends that the documents "appears to be two or three different documents cobbled together, as the last two pages are the same and the information contained is duplicative." (*Id.*)

The Policy Summary is six pages in length, although the final two pages do appear to be identical. (*See generally* ECF No. 65-2.) The beginning of the document states:

> $1 M Liability Insurance ("the Program") provides owners and property managers with primary coverage against claims for accidents involving third-party bodily injury or third-party property damage, provided the incident occurs during a stay corresponding with a reservation processed online through the HomeAway [*i.e.*, HHI] checkout.

(*Id.* at 1.)

The Policy Summary states that "Generali Global Assistance is the insurance provider behind this program," that "HomeAway is the policy holder," and that "owners and property managers that list on the HomeAway family of sites or an authorized affiliate are the insured parties." (ECF No. 65-2 at 1.) It also states that "[t]he current term of the policy underlying the Program began on May 8, 2017" (*id.*), even though—as previously noted—the Generali Policy in effect at the time of the deck collapse began on May 8, 2018. (*See* ECF No. 64-6 at 3.)

The Policy Summary states that the policy described is primary. (*See* ECF No. 65-2 at 5 (stating that the policy "giv[es] you $1,000,000 in primary liability coverage no matter what policy you currently have.").) The Summary explains that "[t]his means that if you don't already have a

8

liability policy, this policy responds first if someone makes a claim against you." (*Id.*) And, it explains, "[i]f you already have a liability policy for your vacation rental, then consider this to be coverage additional to what you already have. It will respond at the same time as your current policy and both policies will contribute if a claim is made against you." (*Id.*; *see also id.* (stating that if a policyholder already has insurance, then "this program works with your current provider and gives you $1,000,000 in added protection").)

Finally, there is a paragraph titled, in large, bold font, "Disclaimer". (ECF No. 65-2 at 4.) It states that "[t]his Program Summary does not contain the full terms and conditions. These can be found in the policy Terms and Conditions document, which is available upon request." (*Id.*)

### c. *The Penn National Policy*

The Penn National Policy was issued to T&R and was effective from May 18, 2018, to May 18, 2019. (ECF No. 64-10 at 3.) The policy provides for a "General Aggregate Limit" of $2 million, and an "Each Occurrence Limit" of $1 million. (*Id.* at 170.) The policy is 175 pages long including all attachments and endorsements; the substantive core is a nineteen-page section entitled "Commercial General Liability Coverage Form." (*Id.* at 88–106.)

Section I defines the scope of coverage, broken down into three categories. The first category of coverage, "Coverage A," covers "bodily injury and property damage liability." (ECF No. 64-10 at 88.) It states that:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

(*Id.*)

It also states that "[o]ur right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical

expenses under Coverage C." (*Id.*)

Section II is entitled "Who Is an Insured." (ECF No. 64-10 at 98.) As relevant here, it

provides as follows:

> If you are designated in the Declarations as . . . [a] limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

(*Id.*)

Section IV, subsection 4 is entitled "Other Insurance". (ECF No. 64-10 at 101.) It provides

as follows:

> If other valid and collectible insurance is available to the insured for a loss we cover . . . , our obligations are limited as follows:
>
> **a.  Primary Insurance**
>
> This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.
>
> **b.  Excess insurance**
>
> (1) This insurance is excess over:  . . .
>
>> (b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.
>
> (2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . .
>
> **c.  Method of Sharing**
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable

limits of insurance of all insurers.

(ECF No. 64-10 at 101.)

An endorsement to the policy provides that:

With respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you, whether such insurance is primary or excess.

(ECF No. 64-10 at 116.)

Finally, the Penn National Policy provides the insurer with a contractual right of subrogation:

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

(ECF No. 64-10 at 102.)

### d. *Alleged Cost-Sharing Agreement and Subsequent Communications*

Penn National alleges that, on April 30, 2020—about a month after the *Twarowski* action was filed—Generali agreed with Chad Taylor, one of the T&R members, to equally share in certain defense costs. (*See* ECF No. 1 ¶ 35.) Specifically, Penn National argues that Generali obligated itself to defend *both* T&R *and* the Taylor/Refoscos (*i.e.*, the Taylor Parties). (ECF No. 65-1 at 3.) Generali, on the other hand, contends that its defense obligation extended only to T&R and not the Taylor/Refoscos.

Before delving into this dispute, a note: In their correspondence described below, the representatives for Generali and Penn National seem to have had some confusion over the exact identity of the company insured by the Generali Policy. Generali's representatives frequently refer to "Taylor-Made" as the insured, although Generali's current position (which Penn National does not dispute) is that Taylor-Made is merely a tradename for T&R, which was the entity insured.

11

(*See* ECF No. 64 at 20 & n.36.)   The Court understands references to Taylor-Made to be functionally equivalent to references to T&R.

On April 30, 2020—about a month after the *Twarowski* action was filed—Bruce Kolln, a Generali claims examiner, sent Chad Taylor an email regarding Generali's participation in that case. (ECF No. 64-13.) Mr. Kolln stated that Taylor-Made "is an insured under Generali's policy no. GL600001-01 . . . issued to [HHI]." (*Id.* at 2.) He also stated that:

> Generali will defend Taylor-Made as a co-primary insurer with Penn Security [*sic*] subject to the rights reserved in this letter including the right to disclaim any indemnity coverage for settlements or a judgment in excess of the $1 million Each Occurrence Per Rental Agreement Limit. This limit is Generali's total Limit of Liability available under the policy for all insureds under the Policy, that is, Taylor-Made, the owners of the Property, HomeAway Holdings, Inc., Expedia, Inc., and any parent and subsidiaries of such organizations.

(*Id.* at 6–7.)

On September 23, 2020, Thomas Hagan, a lawyer for Penn National, sent Mr. Kolln an email referencing the April 30 letter and requesting that Generali reimburse Penn National for half of the approximately $19,000 in legal fees that Penn National had incurred to date in representing the Taylor Parties. (ECF No. 65-3 at 2.) Several months passed, and on February 3, 2021, Mr. Kolln sent a brief response asking Mr. Hagan to "please provide defense reporting and billing to date for review." (*Id.*) Mr. Hagan responded the following day stating that he would "forward to [Mr. Kolln] the legal reports" only after Mr. Kolln first "advise[d] that [he] agree[d] to pay half of the legal bills and expenses and forward[ed] [Generali's] payment." (*Id.* at 1.) Mr. Hagan sent another email a couple days later, listing various payments made by date, but without any breakdown as to what percentage of payments corresponded to which parties. (*Id.*) Mr. Hagan also sent various other updates on legal expenses to Generali representatives, apparently without any confirmation from Generali that it would pay any portion of those bills. (*Id.* at 1; ECF No.

12

65-4 at 10–12.)

In August and September 2021, matters between Penn National and Generali came to a head. On August 10, 2021, Howard Wollitz, an attorney for Generali, sent an email to Mr. Hagan, reaffirming that it "remains the position of Generali that its policy and Penn National's primary policy no. CX90746714 are coprimary for this claim." (ECF No. 65-4 at 7.) Mr. Hagan responded later that same day, asserting his opinion that Penn National's policy was "unquestionably" excess over Generali's. (*Id.*) A few days later, Mr. Hagan sent an email to another Generali claims examiner, stating that "[y]our predecessor had agreed to pay 50% of the fees and bills on this case," but that "[d]espite his agreement Generali has made no reimbursement to Penn National." (*Id.* at 6.) He demanded that Generali pay Penn National $42,495.50, which was half of the total legal bill to date of $84,991. (*Id.* at 6–7.)

Mr. Wollitz responded, again setting out Generali's position as to why the policies were co-primary. (ECF No. 65-4 at 5–6.) He also made the following statement:

> In April 2020, Generali sent a letter to Chad Taylor of Taylor-Made agreeing to split the cost of Taylor-Made's defense with Penn National. Generali never agreed to participate in the defense or indemnification of any other person or entity otherwise insured by Penn National. Generali has seen no evidence that any entity other than Taylor-Made was the property manager for the Heart's Desire property. Generali disclaims any coverage obligation to any person or entity other than Taylor-Made. It is my understanding that Penn National now is demanding that Generali contribute to the defense costs that have been incurred by Penn National for all Penn National's insureds. The complaint names six persons or entities related to Taylor & Refusco [*sic*], including Taylor-Made. Because allocation of fees incurred just for Taylor-Made would be impossible at this time, Generali will agree to pay 1/6 of the total defense costs being incurred by Penn National representing Taylor-Made's share.

(*Id.* at 6.)

Mr. Hagan responded on August 25, 2021, proposing an agreement whereby the parties would agree to equally split defense costs, subject to an understanding that either party could bring

a subsequent declaratory judgment action regarding each insurer's true liability, and that one party might reimburse the other depending on the outcome of that action. (ECF No. 65-4 at 5.) Generali rejected this proposal, and reiterated its willingness to pay one-sixth (but no more than that) of the defense costs incurred by Penn National. (*Id.* at 4.)

Mr. Hagan, in response, rejected Generali's offer to pay one-sixth of the cost, characterizing it as "this 1/6th nonsense." (*Id.* at 3.) The parties continued exchanging emails. On September 9, 2021, Mr. Wollitz again agreed to "participate with [Penn National] in the defense of that entity" (*i.e.*, T&R), but stated that Generali would not share in the cost of defending other parties. (*Id.* at 2.) Finally, Mr. Wollitz made the following comment, which the Court takes to be a reference to the eroding nature of the Generali Policy:

> By the way, you may know that any payment for LAE by Generali consumes its policy limit. Generali's assumption is that [Penn National] continues to press for reimbursement which will diminish the available limit. Is it really [Penn National's] view that it wants Generali's $1M limit impaired?

(ECF No. 65-4 at 2.)

During this exchange, Mr. Hagan declined to share any report of the defense costs broken down by each individual client, taking the position that Penn National would share such information only after Generali had reimbursed it for its expenses. (*See* ECF No. 65-4 at 6.)

Penn National argues that it "relied on Generali's agreement [to share defense costs] to its detriment as once Generali failed to pay, Penn National had to step in to protect the insureds and make sure they had a defense." (ECF No. 65-1 at 17.)

While these disputes between the insurance carriers were ongoing, the Taylor Parties continued to receive a complete defense. Mr. Hagan confirmed this in his deposition. (ECF No. 64-5 at 44 (Q: "And in this case, [T&R], as well as the individual members of [T&R], received a complete defense, yes?" A: "Yes.").)

14

## B. *PROCEDURAL HISTORY*

Penn National filed suit in October 2023. (ECF No. 1.) Acting as subrogee and assignee of the Taylor Parties, Penn National brings four claims against Generali. In Count I, Penn National seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that: (a) the Taylor Parties are insureds under the Generali Policy; (b) the Generali Policy is primary over the Penn National Policy; and (c) Generali was obligated under that policy to defend and indemnify the Taylor Parties in the *Twarowski* action. (ECF No. 1 ¶ 42.) Counts II and III both allege breach of contract. In Count II, Penn National alleges that Generali breached its contractual obligations arising under the Generali Policy by failing to defend the Taylor Parties. (*Id.* ¶¶ 43–47.) Count III alleges that the same failure to defend also constituted a breach of the April 2020 cost-sharing agreement. (*Id.* ¶¶ 48–54.) Finally, in Count IV, Penn National alleges that it is subrogated to the Taylor Parties, and that "[b]ecause Generali was obligated but failed to provide a defense to the Taylor Parties in the [*Twarowski*] Action, Generali is now obligated to reimburse Penn National for the litigation costs Penn National expended in defense of the Taylor Parties in [that] Action." (*Id.* ¶ 59.)

Generali failed to timely respond to the Complaint, and an order of default was issued against it. (ECF No. 17.) Generali then moved to vacate that order, arguing that, through no fault of its own, the summons and Complaint had not been delivered to its designated agent for receipt of service. (*See* ECF No. 25 at 4–5.) In March 2024, the Court vacated the default (*see generally id.*), and Generali filed its answer (ECF No. 26).[2] The parties proceeded to discovery, which closed on March 10, 2025 (*see* ECF No. 55).

---

[2] Generali subsequently obtained leave to file an amended answer, as well as a counterclaim for unjust enrichment. (ECF No. 43.) The counterclaim is essentially coextensive with Generali's denial of liability, as it asserts that it would constitute unjust enrichment if Generali were forced to pay Penn National for the defense costs that Penn National seeks. This counterclaim will be dismissed as moot in light of the Court's grant of summary judgment in Generali's favor.

Generali filed its Motion for Summary Judgment on April 10, 2025. (ECF No. 64.) The Court issued a Memorandum and Order on July 3, 2025, holding that (1) Texas substantive law applied to the dispute, and that (2) Counts I, II, and IV were analytically identical. (*See generally* ECF No. 67.) The Court did not issue a final decision on Generali's Motion, however, because it determined that more briefing was needed on Texas subrogation law. The parties subsequently filed supplemental briefs, and the matter is now ripe for decision.

## II. LEGAL STANDARD

Under Rule 56, a party seeking summary judgment must show that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). If the movant meets this burden, then the nonmoving party cannot rest on mere denials but must point to specific facts showing there is a genuine triable issue in the case. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). In proving the presence or absence of a genuine dispute, either party may point to materials in the record, such as admissions, stipulations, depositions, documents, and electronically stored information. Fed. R. Civ. P. 56(c). In determining whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

## III. ANALYSIS

### A. *LEGAL STANDARD FOR BREACH OF CONTRACT*

Under Texas law, the elements of a claim for breach of contract are: "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the

defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). To make out a claim for breach of an insurance policy, the elements are similar to those of an ordinary breach-of-contract claim—"the plaintiff must show coverage, that the contract was breached, that the insured was damaged by the breach, and the amount of resulting damages." *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, 84 F. Supp. 3d 553, 569–70 (S.D. Tex. 2015).

### B. *COUNTS I, II, AND IV – ALLEGED BREACH OF THE GENERALI POLICY*

#### 1. Who Is an Insured under the Generali Policy

The Generali Policy was issued to HHI. And there is no dispute that T&R is also an insured under the Generali Policy because T&R was a "person or organization that rents a property to a third party through [HHI's] website or the website of [HHI's] parent, its subsidiaries or affiliates using [HHI's] checkout." (ECF No. 64-6 at 15.)

The Taylor/Refoscos, however, were not insureds under the Generali Policy. Penn National argues that these individuals were covered because the Generali Policy states that "any person (other than your 'employee' or 'volunteer worker'), or any organization while acting as your real estate manager" is "also an insured." (ECF No. 64-6 at 15.) "You" is defined as the "Named Insured shown in the Declarations," (*id.* at 9), *i.e.*, HHI, (*see id.* at 3). The term "real estate manager" is not defined in the Policy.

Texas courts "determine the meaning of an undefined term as used in an insurance policy by applying its ordinary and generally accepted meaning, as construed in context and in light of the rules of grammar and common usage." *Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 473–74 (Tex. 2022) (internal

17

quotation marks and citation omitted). Courts "typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Id.* at 474. In ordinary language, a real estate manager is someone who administers or supervises real property. *See Property, Black's Law Dictionary* (12th ed. 2024); *Manager, id.*; *Real Estate, id.* Nothing in the Policy suggests that this definition is not applicable. So, the "real estate manager" clause would appear to mean that non-employees of HHI who administer or supervise HHI's real property are insureds.

Although the Taylor/Refoscos may have been managers of *T&R*'s real property, there is no evidence to suggest that they were managers of *HHI*'s real property. The record does not suggest that HHI owned or had any property interest in the McHenry property, nor that HHI itself managed the real estate in any way. So, the Taylor/Refoscos are not insureds. This is consistent with the results reached by Texas courts interpreting substantially identical clauses in other cases. *See Reule v. Colony Ins. Co.*, 407 S.W.3d 402, 410 n.11 (Tex. App. 2013) (interpreting same clause in a policy issued to a firm called SVI, holding that "the obvious meaning of this particular definition is that any non-employee person *who is acting as SVI's real estate manager* is an insured under the Policy." (emphasis in original)); *Tex. Farm Bureau Mut. Ins. Co. v. Riley*, No. 07-97-0326-CV, 1998 WL 391135, at *4 (Tex. App. July 14, 1998) (holding that an individual was not a "real estate manager" within the meaning of a policy when he managed property for a partnership, where the partnership was the entity that actually owned the property at issue).

Because the Taylor/Refoscos were not insureds under the Generali Policy, Generali had no duty to defend them. *See Nationwide Prop. & Cas. Ins. Co. v. McFarland*, 887 S.W.2d 487, 496 (Tex. App. 1994), *writ denied* (Mar. 30, 1995).

## 2. Whether the Generali and Penn National Policy are Co-Primary

The Penn National and Generali policies are co-primary as to T&R.

This is the classic situation where two insurance policies each provide that they are excess over the other. The Generali policy is, by its terms, primary unless there is other "valid and collectible insurance," in which case it is excess. There is no dispute that the Penn National policy is "valid and collectible" insurance for T&R. The Penn National policy, meanwhile, states that it is primary unless there is other primary insurance for which the insured has been named as an "additional insured," in which case it is excess. As Penn National correctly argues, T&R was an "additional insured" on the Generali Policy, because it is not the party to whom the policy is issued but instead obtains coverage by virtue of a clause providing that "[a]ny person or organization that rents a property to a third party through [HHI's] website" is an insured.[3] *See Westview Drive Invs., LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583, 595 (Tex. App. 2017) ("An 'additional insured' is one whose status—such as that of an employee or a household member—places him within the policy's definition of 'insured.'").

Each otherwise-primary policy provides that it is excess over the other. This creates a conflict. *See Royal Ins. Co. of Am. v. Hartford Underwriters Ins. Co.*, 391 F.3d 639, 644 (5th Cir. 2004) (applying Texas law, and holding that a conflict between insurance policies exists so long as a "reasonable construction" of "other insurance" clauses would render each policy excess over the other).

---

[3] In its opposition brief to Generali's Motion, Penn National did not argue that its policy was primary by virtue of the clause in an endorsement to its policy providing that the policy is excess over "any other valid and collectible insurance with respect to liability arising out of the insured's activities as a "real estate manager." (ECF No. 64-10 at 116.) However, even if the Court could take this clause into account, it would not change the result, because the policies would still create the situation wherein each would be primary but for the existence of the other.

Thankfully, the law is not helpless in this situation.

> "When, from the point of view of the insured, she has coverage from either one of two policies but for the other, and each contains a provision which is reasonably subject to a construction that it conflicts with a provision in the other concurrent insurance, there is a conflict in the provisions." [*Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 589 (Tex. 1969).] If the policies conflict, the court may ignore the "offending provisions" and look to the remainder of the policies to determine which policy should provide coverage. *Id.* If both policies provide coverage, and priority is uncertain, liability is prorated between the insurers. *Id.* at 590.

*Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 93 (5th Cir. 2012).

Because T&R would have primary insurance from one of the two policies but for the existence of the other, the Court "excise[s] the conflicting language" in the policies "and look[s] to the remainder of their language." *Id.* Both policies otherwise provide that they are primary. So, the Court holds that the policies are co-primary as to T&R.[4] *See id.*; *U.S. Fidelity & Guar. Co. v. Coastal Refining & Mktg, Inc.*, 369 S.W.3d 559, 567–69 (Tex. App. 2012).

### 3. Whether Penn National Can Recover in Subrogation

Texas law recognizes three types of subrogation—equitable, contractual, and statutory. *Tex. Health Ins. Risk Pool v. Sigmundik*, 315 S.W.3d 12, 14 (Tex. 2010).[5] The elements of equitable subrogation are that (1) the plaintiff paid the debt for another who was "primarily liable on the debt," and (2) the plaintiff paid that debt involuntarily. *Bank of Am. v. Babu*, 340 S.W.3d

---

[4] The Generali Summary Document (ECF No. 65-2) does not change this outcome. First, the document is not authenticated, and it is not clear whether it could be converted to an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); 10A *Wright & Miller's Federal Practice & Procedure* § 2721 (4th ed. 2025). Second, even assuming the Court could consider the document, it cannot change the terms of the Generali Policy. That is true both because (a) the document refers to a policy period beginning "May 8, 2017" even though the Generali Policy did not begin until May 8, *2018* (*see* ECF No. 65-2 at 1), and (b) the document itself warns the reader that it does not contain the full terms and conditions of the policy (*see id.* at 4). Moreover, subject to exceptions not relevant here, "[u]nder Texas law, . . . waiver and estoppel cannot operate to change either the risks covered or the insurance extended under a policy." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 660 (5th Cir. 1999).

[5] Statutory subrogation is not relevant here, so the remainder of the discussion focuses on the first two types.

917, 925 (Tex. App. 2011); *Wagner v. Exxon Mobil Corp.*, 654 S.W.3d 613, 639–40 (Tex. App. 2022). Contractual subrogation arises by an agreement between parties whereby one party is granted the right to pursue reimbursement from a third party in exchange for payment of a loss. *Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 298 S.W.3d 216, 223 (Tex. App. 2009). "In either case, the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." *Mid–Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007).

### a. *The* Mid–Continent *Case*

*Mid–Continent* is the leading case on subrogation in coverage disputes between insurers. There, two insurers—Liberty Mutual and Mid–Continent—provided co-primary liability insurance to a defendant in a tort action. 236 S.W.3d at 768. Each insurer's policy had an "other insurance" clause providing for equal or pro rata sharing if another primary insurer covered the loss. *Id.* at 769. They cooperatively assumed defense of the insured, but disagreed as to the settlement value of the case. *Id.* at 768–70. The suit was settled for $1.5 million, but Liberty Mutual contributed a disproportionate share, after Mid–Continent refused to contribute more than $150,000. *Id.* Liberty Mutual then sued Mid–Continent for the amount that it paid over and above its pro rata share, bringing claims for contribution and subrogation. *Id.*

The Texas Supreme Court held that Liberty Mutual could not recover in *contribution* because the effect of the "pro rata" clauses made the two insurance contracts "several and independent of each other," such that the plaintiff could not establish that the parties shared a "common obligation," as needed for a successful contribution claim. *Id.* at 772–73. As for *subrogation*, Liberty Mutual could not recover under either a contractual or equitable subrogation theory. *Id.* at 774–76. Although its policy contained a subrogation clause, Liberty Mutual could

not recover under it because Liberty Mutual was merely stepping into the shoes of the insured and the insured "ha[d] no right, after being fully indemnified, to enforce Mid–Continent's duty to pay its pro rata share of a loss." *Id.* at 775. As the court explained:

> [A] fully indemnified insured has no right to recover an additional pro rata portion of settlement from an insurer regardless of that insurer's contribution to the settlement. Having fully recovered its loss, an insured has no contractual rights that a co-insurer may assert against another co-insurer in subrogation.

*Id.* at 775–76. Liberty Mutual also could not recover under an equitable subrogation theory because, among other reasons, equitable subrogation requires that "the subrogee pay a debt for which another was primarily liable." *Id.* at 776. Because Liberty Mutual, as a co-primary insurer, was *also* primarily liable for the indemnification, it could not satisfy the requirements of equitable contribution. *Id.*

### b. *Whether* Mid–Continent *Applies to Subrogation Claims Involving the Duty to Defend*

Federal courts applying Texas law have read *Mid–Continent* narrowly, applying it only in "situations where the insurers (1) were co-primary insurers; (2) did not dispute that both covered the loss; and (3) were subject to pro rata clauses." *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 258 (5th Cir. 2011); *see also Cont'l Cas.*, 683 F.3d at 85–88; *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 306 (5th Cir. 2010). The reason why *Mid–Continent* has become somewhat disfavored—at least in federal court—seems to rest on both doctrinal and policy grounds. On the doctrinal level, the Fifth Circuit has criticized what it characterized as the "empty shoes" reasoning behind *Mid–Continent*, observing that "there will almost always be 'empty shoes' when a court is dealing with the legal fiction of subrogation." *Cont'l Cas. Co.*, 683 F.3d at 88. And on policy grounds, courts have worried that applying *Mid–Continent* broadly would "deviate[] from settled principles of Texas insurance law by discouraging insurers from first

defending and indemnifying and then seeking reimbursement for the costs that a coinsurer should have paid." *Amerisure*, 611 F.3d at 308.

That said, the facts of this case appear to fall within the rule of *Mid–Continent*, even assuming that the Fifth Circuit is correct in giving that case such a narrow ambit. *Cf. Great Am. Assurance Co. v. Wills*, Civ. No. SA-10-353-XR, 2012 WL 13029762, at \*9 (W.D. Tex. July 24, 2012) ("[W]hile the Fifth Circuit's interpretation of *Mid–Continent* is narrow, it is not so restrictive as to preclude the application of *Mid–Continent* in every case."). Penn National and Generali were co-primary, and each policy contained an "other insurance" clause providing for pro rata apportionment. And, although Generali never paid for the defense of T&R, it repeatedly conceded coverage and offered to share with Penn National in the costs of T&R's defense. Thus, all three prerequisites for applying *Mid–Continent* are in place.

But there is a reason to pause before applying *Mid–Continent*. As the Fifth Circuit has noted, "*Mid–Continent* only addressed the question of whether one co-insurer has a right of contribution or subrogation against a non-paying co-insurer to recover money paid to *indemnify* a common insured for a loss." *Trinity Universal Ins. Co. v. Emps. Mut. Cas. Co.*, 592 F.3d 687, 694 (5th Cir. 2010). It "left open the separate question of whether a co-insurer that pays more than its share of *defense costs* may recover such costs from a co-insurer who violates its duty to defend a common insured." *Id.* "The duty to defend is distinct from, and broader than, the duty to indemnify." *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008) (alteration accepted; citation omitted). Given the strong public policy interest in protecting the right of an insured to receive a complete defense, a court should not mechanically import precedent concerning the duty to indemnify into contexts involving the duty to defend.

When it comes to claims for contribution, federal and state courts have reached opposite

conclusions on the question of whether *Mid–Continent* applies to the duty to defend as well as the

duty to indemnify. The Fifth Circuit has held that *Mid–Continent* does not bar a contribution claim

against a co-insurer who breaches the duty to defend, reasoning that even with a pro rata clause,

"the insurer has a duty to provide a *complete* defense," so co-insurers share a common obligation,

as needed for a contribution claim. *Trinity*, 592 F.3d at 695. The Court of Appeals of Texas (the

state intermediate appellate court) disagrees. It considered and expressly rejected the holding of

*Trinity*, noting that *Mid-Continent* relied on two earlier Texas Supreme Court precedents providing

that "the existence of an 'other insurance' clause precludes a contribution claim for defense costs"

(in addition to indemnification costs). *Truck Ins. Exch. v. Mid-Continent Cas. Co.*, 320 S.W.3d

613, 621–23 (Tex. App. 2010) (first citing *Employers Cas. Co. v. Transport Ins. Co.*, 444 S.W.2d

606, 607 (Tex. 1969), and then citing *Traders & Gen. Ins. Co. v. Hicks Rubber Co.*, 169 S.W.2d

142, 148 (Tex. 1943)).

When, as here, federal and state courts have come to differing conclusions on a question

of state law, the state court's view will usually prevail:

> When no decision from the State's highest court provides guidance on a question
> of state law, we consult decisions of the State's intermediate appellate court. We
> may not decide a question of state law differently than the State's intermediate
> appellate court has done in a decision directly on point unless we are convinced by
> other persuasive data that the highest court of the State would decide otherwise.

*Carpenter, Tr. for H. Joe King, Jr. Revocable Tr. v. William Douglas Mgmt., Inc.*, 132 F.4th 280,

284 (4th Cir. 2025) (internal quotation marks and citation omitted; alteration accepted).

Here, the Court is not "convinced" that the Texas Supreme Court would differ with the

result reached by the Texas Court of Appeals in *Truck Insurance*. The *Truck Insurance* opinion is

well reasoned and explains how its holding is consistent not only with *Mid–Continent* itself but

with earlier Texas Supreme Court precedent. To be sure, *Trinity* is well reasoned, too, but it does

24

not grapple with that earlier Texas Supreme Court precedent. In short, *Trinity* is not so persuasive as to convince this Court that *Truck Insurance* got it wrong.

So, *Mid–Continent* can apply to bar claims brought in contribution seeking to recoup defense costs. There is just one final question to answer. Neither *Trinity* nor *Truck Insurance* expressly addressed whether *Mid–Continent* can also apply to bar claims for defense costs brought in *subrogation* rather than contribution. *See Trinity*, 592 F.3d at 696 (stating that it does not "reach th[e] issue of subrogation"). Neither of the cases on which each party principally relies is completely on point.[6] Indeed, the Court is not aware of any controlling authority to have spoken to this precise issue. So, the Court does its best to predict how the Texas Supreme Court would rule. *Carpenter*, 132 F4th at 284.[7] The Court holds that *Mid–Continent* applies to subrogation claims involving the duty to defend as well as the duty to indemnify.

Nothing in the discussion of subrogation in *Mid–Continent* itself suggests that its logic is

---

[6] Penn National relies chiefly on the Fifth Circuit's holding in *Continental Casualty* that an excess insurer was entitled to recover defense costs, under a contractual subrogation theory, from primary insurers who denied coverage. *See* 683 F.3d 86–88. But here, Penn National is not an excess but rather a co-primary insurer, and moreover Generali never denied coverage as to T&R. So, this case is distinguishable.

Generali, meanwhile, relies heavily on *Coreslab Structures (Tex.), Inc. v. Scottsdale Ins. Co.*, 496 S.W.3d 884 (Tex. App. 2016). In that case, an insured filed suit against its insurer, arguing that it breached its duty to defend. The court held that the insured could not recover because it in fact received a complete defense from a co-insurer, Lexington. As it explained, "[e]ven presuming that Scottsdale should have paid more and that Lexington should have paid less, once the full amount of defense costs have been paid, Coreslab has no right to recover against Scottsdale based on Scottsdale's failure to pay more." *Id.* at 889. *Coreslab* has limited applicability here because this is not a case of the insured—here, T&R—suing Generali, but rather a co-insurer doing so. Notably, the *Coreslab* court expressly noted that "there might be a basis for Lexington to seek recovery against Scottsdale under these circumstances, [but] Lexington is not a party in this case." *Id.* In the instant action, Penn National is in an analogous position to Lexington. The present case, then, appears to fall within the area that the *Coreslab* court declined to reach.

[7] Federal courts often certify open questions of state law to state supreme courts. This case may present a good candidate for certification. However, "[t]his Court is without the means to certify an unsettled question of state law to the Texas Supreme Court, as that court does not permit federal district courts to certify questions of Texas law." *Norman v. Dallas Tex. Healthcare LLC*, Civ. No. 3:20-03022-L, 2023 WL 4157485, at *5 (June 7, 2023) (citing Tex. R. App. P. 58.1), *report and recommendation adopted*, 2023 WL 8791183 (N.D. Tex. Dec. 19, 2023).

limited to indemnification. As the court there explained, a co-insurer suing in subrogation on behalf of an insured steps into the insured's shoes to assert only those rights held by the insured against the co-insurer, subject to any defenses the insurer may have against the insured. 236 S.W.3d at 775. Because the insured in that case received the full indemnification to which it was entitled, the insured (and, thus, the insurer in whose shoes it stood) "[h]aving fully recovered its loss, ... has no contractual rights that a co-insurer may assert against another co-insurer in subrogation." *Id.* at 776. This logic applies with equal force to the duty to defend. An insured has a contractual right to a complete defense. But having received such a defense, it has no right to obtain *more* than a complete defense; an insured cannot obtain a double recovery. *See id.* at 775 ("One reason that the right of equitable subrogation is granted to an insurer is to prevent the insured from receiving a double recovery." (quoting *Ortiz v. Great S. Fire and Cas. Ins. Co.*, 597 S.W.2d 342, 343 (Tex. 1980)).)

### c. *Application of* Mid–Continent *to Penn National's Claims*

Having concluded that *Mid–Continent* is applicable, the Court now turns to the two theories of subrogation under which Penn National seeks to recover.[8]

First, contractual subrogation. Penn National has the contractual right to subrogation under the terms of its policy, but only to the extent that the insured has "rights to recover" a payment. (ECF No. 64-10 at 102.) Because the insured—here, T&R—undisputedly received the complete defense to which it was entitled, it has no claim that it could assert against Generali; hence, Penn National, standing in T&R's shoes, has no claim either.[9] This is consistent with the result reached

---

[8] Penn National does not bring a claim for contribution, so the Court does not consider the question of whether it would have a viable cause of action under that theory.

[9] In any event, by the terms of the Generali Policy, once it had paid the limits of its policy, its duty to defend terminated. (*See* ECF No. 64-6 at 9.) A Texas appellate court, reviewing almost identical language, held that "the only reasonable interpretation of this policy language is that the insurer will defend or settle any

in *Mid–Continent*. *See* 236 S.W.3d at 775.

Penn National also cannot recover under a theory of equitable subrogation. To prevail, Penn National would have to show that it was not "primarily liable" for the defense costs. *Mid–Continent*, 236 S.W.3d at 776. But Penn National cannot make that showing, because as the Court has explained *supra* Part III.B.2, it was a co-primary insurer. So, it cannot establish this basic requirement of equitable subrogation. This follows directly from *Mid–Continent*, which is precisely on point. *See id.* at 776 ("[W]e note Liberty Mutual paid a debt for which it too was primarily liable, thus not satisfying the traditional subrogation requirement that the subrogee pay a debt for which another was primarily liable."); *see also Great Am. Assurance*, 2012 WL 13029762, at *7 (holding that a co-primary insurer could not recover in equitable subrogation). Because Penn National cannot satisfy the first element of equitable subrogation, the Court need not address the question whether Penn National made the defense payments "voluntarily."

### d. *Equitable and Policy Considerations*

The Court is not blind to the policy concerns that have led some courts to limit *Mid–Continent*'s reach. The law should not incentivize insurers to decline to fund their insured's defense in the hopes that a co-insurer will pick up the tab. However, policy concerns are blunted by several facts of this case that are important to the Court's conclusion. *See Babu*, 340 S.W.3d at 925 (stating that each case of equitable subrogation "turns on its own facts" (citation omitted)); *Cont'l Cas. Co.*, 683 F.3d at 86 (stating that "the facts of each case must be considered" when evaluating a claim for contractual subrogation).

First, Generali expressly and repeatedly conceded that it covered T&R and had a duty to

---

claim, but the defense obligation will terminate if and when the insurer's policy limits are exhausted." *Am. States Ins. Co. of Tex. v. Arnold*, 930 S.W.2d 196, 201 (Tex. App. 1996). Here, it is undisputed that Generali exhausted its policy limits when it contributed toward the *Twarowski* settlement.

defend it, and repeatedly offered to pay its share of T&R's legal fees. (*See, e.g.*, ECF No. 65-4 at 1–2.) There is no genuine dispute on this factual question, even when viewing the facts in the light most favorable to Penn National. Thus, at all times T&R "was fully protected because both insurers acknowledged their duties to defend and indemnify." *Amerisure*, 611 F.3d at 307 (noting that this is relevant to whether to permit contractual subrogation).

Second, because Generali's policy was an eroding one, it had little incentive to deny defense and only contribute to indemnification, because any amount spent on defense would have offset, on a dollar-for-dollar basis, the amount spent on indemnification. The "purpose of equitable subrogation is to prevent unjust enrichment of the debtor." *Babu*, 340 S.W.3d at 925 (citing *First Nat'l Bank of Kerrville v. O'Dell*, 856 S.W.2d 410, 415 (Tex. 1993)). Because of the eroding nature of the Generali policy, Generali was not "enriched" in any way by not paying T&R's defense costs, because it *still* ultimately paid out the entirety of its policy limits (which included defense costs) when it contributed to the settlement of the action. To permit a party to recover up to the policy limit *plus* defense costs would functionally serve to convert an eroding policy into a non-eroding one. Such a result would contravene basic principles of insurance law. *See N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 559 (5th Cir. 2008) (applying Texas law, and stating that "[e]ven more importantly, if the insured wanted a policy that had an unlimited defense obligation, rather than an eroding one, it should have contracted for such a policy. North American's argument would actually give the [insured] the benefit of an additional $1 million in defense costs coverage, despite its failure to contract for that coverage.").

On the facts of this case—when an insurer has an eroding-limits policy, agrees to contribute to defense costs (even if it does not actually do so), and ultimately ends up paying the full limits of its policy—policy concerns about applying *Mid–Continent* do not mandate a result different

28

from the one the Court reaches today.

## C. *COUNT III – ALLEGED BREACH OF THE COST-SHARING AGREEMENT*

Finally, the Court turns to Penn National's claim for breach of contract with respect to the alleged April 2020 agreement. The problem for Penn National is the letter that Penn National claims forms the basis of the agreement is a correspondence between Generali and Chad Taylor. (*See generally* ECF No. 64-13.) So even assuming, *arguendo*, that this letter created contractual obligations—which is doubtful[10]—it is patently clear that this letter does not create a contract *between Generali and Penn National*. In any event, Penn National does not advance any argument—much less cite any evidence—as to how this document formed an agreement between the parties to the instant suit. And even if Penn National should be understood to argue that it was a third-party beneficiary to the purported April 2020 agreement—a theory that, again, Penn National does not advance—that would be unavailing. There is no evidence that either party intended Penn National (rather than the Taylor Parties) to benefit from any agreement, as would be required to prevail under such a theory. *See MCI Telecomm'ns Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999).

That is enough to decide Count IV in Generali's favor, as the Complaint unambiguously alleges that the contract alleged to be breached was the "Defense Cost Agreement" that "Generali and Penn National entered into" "[o]n or about April 30, 2020." (ECF No. 1 ¶ 49.) To the extent that Penn National advances new theories or causes of action now, such an attempt must fail. *See*

---

[10] A reservation-of-rights letter "cannot create rights not contained in the insurance policy." *Tex. Ass'n of Cntys. Cnty. Gov't Risk Mgmt. Pool v. Matagorda Cnty.*, 52 S.W.3d 128, 131 (Tex. 2000). To the extent that such a letter is at variance with the policy, it is understood as—at most—an offer to revise that policy. *Id.* Of course, as with any contract, such an offer "is binding only if [the insured] accepts it." *Id.* at 132. Here, even assuming that the April 2020 letter offered changes to the Generali policy, there is no evidence in the record that any of the Taylor Parties accepted the offer. *See id.* ("[A]s a general rule, 'silence and inaction will not be construed as an assent to an offer . . .'" (citing 2 *Williston on Contracts* § 6:49 (4th ed. 1991))).

*S. Walk at Broadlands Homeowners Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."). In any event, to the extent that Penn National argues now that the contract at issue somehow formed later, during subsequent discussions between Penn National and Generali, such an argument is meritless, as the parties never reached any agreement. The undisputed evidence shows that, although Generali offered to agree with Penn National to be co-primary, Penn National expressly *rejected* that offer; and when Generali later offered to pay one-sixth of the costs Penn National had incurred, Penn National rejected that too. Likewise, Generali expressly rejected Penn National's offer to share costs equally. As any first-year law student knows, there can be no contract without both offer and acceptance. *Angel, Tr. for Gobsmack Gift Tr. v. Tauch*, 642 S.W.3d 481, 483 (Tex. 2022).

Finally, as for detrimental reliance, this too is a theory that Penn National raises for the first time in its briefing. For that reason alone, any recovery under this theory is foreclosed.

## IV. CONCLUSION

For the foregoing reasons, Generali's Motion for Summary Judgment (ECF No. 64) will be granted, judgment will be entered in favor of Generali and against Penn National, and this case will be closed. Further, Generali's counterclaim for unjust enrichment (ECF No. 43 at 12–16) will be dismissed as moot. A separate order will issue.

DATED this 22 day of August, 2025.

BY THE COURT:

James K. Bredar
United States District Judge

30